UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

26CR197 JWB

UNITED STATES OF AMERICA,

v.

HABIBA MOHAMED,

Defendant.

**INFORMATION**

18 U.S.C. § 371

RECEIVED
OCT 29 2026
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At times relevant to this Information:

1. Medicaid was a health and long-term care coverage program jointly financed by states and the federal government pursuant to the Social Security Act of 1965 that provided benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. The Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"), was responsible for overseeing Medicaid in participating states, including Minnesota.

2. Individuals who received benefits under Medicaid were referred to as "recipients."

3. Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

4. Each state, including Minnesota, established and administered its own

LT SCANNED
OCT 30 2026
U.S. DISTRICT COURT MPLS

Medicaid program and determined the type, amount, duration, and scope of services covered within broad federal guidelines.

5. Medicaid covered the costs of medical services and products ranging from routine preventative medical care for children to institutional care for the elderly and disabled. Service providers were authorized to submit claims to Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of services. By submitting a claim, the provider certified, among other things, that the services were medically necessary, rendered to the patient as represented, and not rendered as a result of kickbacks or bribes.

6. In Minnesota, Medicaid was administered by the Minnesota Department of Human Services ("DHS").

7. Medicaid providers were required to meet certain requirements to participate in the Medicaid program, including billing and recordkeeping requirements. In Minnesota, these requirements were set forth in the Minnesota Health Care Programs ("MHCP") Provider Manual.

**A. The Minnesota Early Intensive Development and Behavioral Intervention ("EIDBI") Program**

8. Autism spectrum disorder ("ASD" or "autism") was a neurological and developmental disorder that affected how people interact with others, communicate, learn, and behave.

9. Applied Behavior Analysis, sometimes called "ABA therapy," was a type of one-on-one behavioral therapy designed to help children on the autism spectrum

develop social and emotional skills. ABA therapy sought to improve social skills by rewarding and reinforcing positive behavior while discouraging negative behavior.

10. The EIDBI program was a federally-funded Minnesota health care program. According to the DHS website, the purpose of the EIDBI program was "to provide medically necessary, early and intensive intervention for people with ASD and related conditions."

11. The EIDBI program covered various treatment options, including ABA therapy, for persons diagnosed with ASD and related conditions.

12. In order to qualify for the EIDBI benefit, a person must have been less than 21 years old; have been diagnosed with ASD or a related condition; have had a comprehensive multi-disciplinary evaluation ("CMDE") that established his or her medical need for EIDBI services; and have been enrolled in a qualifying health care program, such as Medicaid.

13. The CMDE was used to develop the person's individual treatment plan ("ITP"). An ITP was a personalized, written plan of care that outlined the goals for the person and set forth the specific interventions the person would receive based on his or her individually assessed needs.

14. EIDBI provider agencies were legal entities or individuals approved by DHS and the State of Minnesota to provide EIDBI services.

15. EIDBI treatment services were required to be delivered under the supervision of a Qualified Supervising Professional ("QSP") who was employed by the EIDBI provider. A QSP supervised and managed all aspects of EIDBI services,

treatment, and documentation, including supervising the medical providers who provided services. The QSP assumed full professional responsibility for the services provided by each supervisee, including the supervisee's actions and decisions.

16. Level I and Level II providers oversaw the implementation of ITPs and worked with EIDBI client-patients. Providers participated in monitoring progress, goals, objectives, and treatment outcomes. All providers were responsible for documenting all services provided in case notes. Level I and Level II providers were required to meet certain, defined qualifications, including education and experience qualifications. The qualifications for Level I providers were more stringent than the qualifications for Level II providers.

17. The MHCP Provider Manual provided information specific to each category of enrolled provider, including EIDBI providers, who billed codes related to ABA therapy services for ASD.

18. EIDBI professionals, like other providers of services to Medicaid recipients through MHCP, were required to observe rules designed to ensure quality of care, medical necessity, and the appropriate and accurate billing of services provided. Those requirements included the following:

a. Health Service Records. As a condition for payment, the provider was required to document each occurrence of a health service provided to a recipient. The health service was required to be documented in the recipient's health service record, and was required to include the following: the recipient's personal information and legal representative; the date on which the entry was

made; the date or dates on which the health service was provided; contact information for the QSP; information about other services the person or legal representative received; the start and stop times and/or length of time spent with the recipient if the amount paid for the service depends on time spent; the signature and title of the person from whom the recipient received the service; completed and current CDME; completed and current ITP; a plan for providing clinical supervision, observation, and direction to individual providers; and preferences of the parent(s) and/or caregiver(s) for EIDBI services, including their level of involvement.

b. Retention of Claims Records and Other Documentation. Providers were required to retain records, including all health service and financial records related to a health service for which payment under a program was received or billed, for at least five years after the initial date of billing. The retention requirement applied to a provider after withdrawal or termination from the program, and after a change of ownership.

c. Billing Procedures. EIDBI providers were required to follow DHS billing rules designed to ensure the submission of accurate and honest reimbursement of claims for services actually provided. The requirements regarding claims submission to DHS were set forth in the MHCP Provider Manual and included the following:

i. Billing for Services Actually Provided. Providers who contracted with DHS agreed to bill for services actually provided.

Providers submitted claims to DHS electronically and under a recipient's individual identifying number. The claims provided a procedure code, indicating the service, along with the provider's Unique Minnesota Provider Identifier and National Provider Identifier ("NPI") for direct payment to the provider. The claims also identified the medical professional who prescribed or ordered the service, as entered by the provider.

ii. Billing Only After Services Have Been Provided. Providers were required to submit claims to DHS only after covered services were rendered. Providers were not allowed to submit reimbursement claims for services purportedly to be provided at a future time.

19. MHCP also required providers to disclose the identity of any person or business with an ownership and controlling interest in the provider business entity, as well as the identity of any board member, officer, business and finance controller (e.g., Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Chief Operating Officer ("COO"), and Chief Technology Officer ("CTO")), and managing employee, at the time of enrollment in the program and upon any change in ownership or controlling interest in the business.

20. DHS defined an "owner" as any person or business that had a direct or indirect controlling interest of 5% or more in the business entity.

21. DHS defined "managing employee" as a person other than the CEO, CFO, COO, or CTO, who exercised operational or managerial control over, or who

directly or indirectly conducted or managed the day-to-day operations, such as a general manager, business manager, administrator, or director.

**B. The Defendant, Related Individuals, and Related Entities**

22. Defendant HABIBA MOHAMED was a resident of the State of Minnesota and a beneficial owner of Smart Therapy Center LLC ("Smart Therapy"). Between in or around September 2022 through in or around September 2024, HABIBA MOHAMED also worked as Smart Therapy's Clinical Director. In addition to working as Smart Therapy's Clinical Director, HABIBA MOHAMED handled training, hiring and firing, and dealt with third-party vendors on behalf of Smart Therapy.

23. Shamso Ahmed Hassan was a resident of the State of Minnesota and a beneficial owner of Smart Therapy Center LLC ("Smart Therapy").

24. Asha Farhan Hassan was a resident of the State of Minnesota and a beneficial owner of Smart Therapy.

25. Individual #1 was a resident of the State of Minnesota and a beneficial owner of Smart Therapy.

26. On or about November 21, 2019, Asha Farhan Hassan formed Smart Therapy in the State of Minnesota. Asha Farhan Hassan enrolled Smart Therapy in the EIDBI program as a provider agency on or about December 10, 2019.

27. On or about March 2, 2023, Shamso Ahmed Hassan, Asha Farhan Hassan, Individual #1, HABIBA MOHAMED and another individual signed and executed an Operating Agreement for Smart Therapy where Shamso Ahmed Hassan

and Asha Farhan Hassan each held a 35% ownership interest, Individual #1 held a 10% ownership interest, and HABIBA MOHAMED and the other individual each held a 10% ownership interest.

## **COUNT 1**
(Conspiracy to Defraud the United States)

28. Paragraphs 1 through 27 of this Information are realleged and incorporated by reference as though fully set forth herein.

29. Beginning in or around September 2022, and continuing through in or around September 2024, in the State and District of Minnesota and elsewhere, the defendant,

HABIBA MOHAMED,

did knowingly and willfully combine, conspire, confederate and agree with Asha Farhan Hassan, Shamso Ahmed Hassan, and others known and unknown,
to defraud the United States by cheating the United States government and any of its agencies and departments out of money and property, and by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of HHS and CMS, in their administration and oversight of Medicaid.

### **Purpose of the Conspiracy**

30. It was a purpose of the conspiracy for HABIBA MOHAMED, Asha Farhan Hassan, Shamso Ahmed Hassan, and others known and unknown, to unlawfully enrich themselves and others by, among other things, (a) offering, paying, soliciting, and receiving illegal kickbacks and bribes to parents in exchange for

sending their Medicaid-eligible children to Smart Therapy so that Smart Therapy could bill for EIDBI services purportedly performed on behalf of those children; (b) submitting and causing the submission of claims to Medicaid through DHS for EIDBI services that were (i) not medically necessary; (ii) not provided as represented; and/or (iii) obtained through the payment of kickbacks and bribes and therefore not eligible for reimbursement; (c) concealing the offering, paying, soliciting, and receiving of kickbacks and bribes and the submission of false and fraudulent claims to Medicaid; and (d) diverting fraud proceeds for the personal use and benefit of HABIBA MOHAMED and her co-conspirators, the use and benefit of others, and to further the fraud.

**Manner and Means of the Conspiracy**

31. The manner and means by which HABIBA MOHAMED, Asha Farhan Hassan, Shamso Ahmed Hassan, and others known and unknown, sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

a. HABIBA MOHAMED, Asha Farhan Hassan, Shamso Ahmed Hassan, and others paid illegal cash kickbacks of approximately $300 to $1,500 per month, per child, to parents in exchange for sending their Medicaid-eligible children to Smart Therapy.

b. HABIBA MOHAMED, Asha Farhan Hassan, Shamso Ahmed Hassan, and others disguised the kickbacks by writing checks payable to family members and employees and directing them to cash the checks and give

the cash to parents monthly, and by referring to the illegal kickback payments using the code word "computer."

c. To fund the kickback payments, Smart Therapy, through Asha Farhan Hassan and others, submitted claims for Medicaid reimbursement to DHS that were significantly inflated, or for EIDBI services that were not actually rendered. For example, Smart Therapy billed for a significant volume of family and caregiver training that rarely, if ever, was provided.

d. From in or around September 2022 through in or around September 2024, Smart Therapy submitted and caused the submission of false and fraudulent claims to Medicaid in the amount of approximately $19.8 million for EIDBI services that were medically unnecessary, not actually provided, not eligible for reimbursement, and procured through illegal kickbacks on behalf of Smart Therapy, for which Medicaid reimbursed Smart Therapy approximately $7.7 million.

## Overt Acts

32. In furtherance of the conspiracy, and to accomplish its objects and purposes, HABIBA MOHAMED and her co-conspirators committed and caused to be committed, in the State and District of Minnesota, and elsewhere, the following overt acts:

a. On or about August 24, 2023, HABIBA MOHAMED deposited a check for $15,000 from Smart Therapy into her personal bank account.

b. On or about August 24, 2023, HABIBA MOHAMED withdrew $7,500 in cash from her personal bank account for the purpose of paying illegal kickbacks to the parents of children enrolled at Smart Therapy.

c. On or about August 25, 2023, HABIBA MOHAMED deposited a check for $15,000 from Smart Therapy into her personal bank account.

d. On or about August 25, 2023, HABIBA MOHAMED withdrew $5,000 in cash from her personal bank account for the purpose of paying illegal kickbacks to the parents of children enrolled at Smart Therapy.

(Title 18, United States Code, Section 371)

Dated:

DANIEL N. ROSEN
United States Attorney

*s/ Rebecca E. Kline*
BY: REBECCA E. KLINE
Assistant United States Attorney

REBECCA YUAN
Acting Chief, Health Care Fraud Section
National Fraud Enforcement Division

*s/ Sara E. Porter*
BY: SARA E. PORTER
Deputy Chief
Health Care Fraud Section
National Fraud Enforcement Division

MANU J. SEBASTIAN
Trial Attorney
National Fraud Enforcement Division